Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Raul Mendez, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Does 1-5; The United States of America,<br><br>Defendants. | Case No.: CV-25-01048-PHX-SMB<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>(Assigned to the Honorable Susan M. Brnovich) |

Plaintiff Raul Mendez ("Plaintiff"), by and through his undersigned counsel, files this First Amended Complaint (the "First Amended Complaint") against Defendants Does 1-5 and The United States of America ("USA"). In support of said First Amended Complaint, Plaintiff states and alleges the following:

**JURISDICTION AND VENUE**

1.      This court has jurisdiction over this action and the claim contained herein pursuant to 28 U.S.C. § 1331. This court further has jurisdiction over the Federal Tort Claims Act claim pursuant to 28 USC § 1346(b)(1)2.

2.      The acts and omissions giving rise to Plaintiff's claim occurred within the geographic boundaries of the County of Maricopa. Therefore, the appropriate venue for

this action is in the United States District Court for the District of Arizona, Phoenix Division pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).

3.    The amount in controversy exceeds the minimal jurisdictional limits of this Court.

## JURY DEMAND

4.    Plaintiff demands a trial by jury in this action.

## THE PARTIES

5.    Plaintiff Raul Mendez is an individual, a citizen of the United States, and a resident of Arizona. At all relevant times to the present Complaint, Plaintiff resided in Maricopa County, Arizona.

6.    The true names and capacities of the defendants DOE 1 through 5 are unknown to Plaintiff at this time but include potential USA Army service members who were assigned to supervise and monitor Hunt and alert law enforcement of suspected unlawful behavior. Therefore, Plaintiff sues these defendants by such fictitious names. Plaintiff is informed and believes that each of the defendants designated as a DOE acted wrongfully and is responsible in some fashion for Plaintiff's injuries as herein alleged. These DOE defendants will be later named when and if their identities and further information is obtained or made known to Plaintiff.

7.    Defendant The United States of America ("USA") is a governmental entity.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

2

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## **BACKGROUND / FACTUAL ALLEGATIONS**

8.    This action arises from the failure of the USA Army to properly monitor an active-duty service member – Jason Hunt – for psychological and mental concerns, which left unaddressed caused a mass shooting to occur at the hands of Hunt.

9.    On July 3, 2022, between 10:00 p.m. and 10:28 p.m., 45-year-old Jason Hunt, shot and killed two people and seriously injured 4 others (the "Incident"), while at his neighbor's family gathering located at 14448 W. Carlin Dr., Surprise, AZ 85374 (the "Incident Location").

10.    Hunt was also shot during this incident and succumbed to his injuries during an encounter with one of the victims in self-defense.

11.    Hunt began displaying his guns publicly on Instagram with disturbing captions pointing to mental health decline and an increasing desire to use his weapons.

12.    On June 16, 2022, with the caption "Time to clean the toys!! Pew Pew", Hunt posted the following on his Instagram:



3

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

13. On June 29, 2022, with the caption "getting ready to celebrate our Independence day!! Who's with me?? ususus", Hunt posted the following:

14. These posts are important, because upon information and belief, the USA Army regularly performed psychological evaluations on Mr. Hunt.

15. Hunt's behavior surrounding his weapons and desires to use them were clearly escalating, such the USA Army should have known and upon information and belief did know that emergent steps had to be taken to prevent one of its active-duty servicemembers from harming the public, including Plaintiff.

16. It is believed that these evaluations showed that Mr. Hunt had potential mental disabilities that could result in harm to members of the public.

17. This is exactly what happened in the Incident.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18.     Hunt's deteriorating mental health around weaponry was on public display such that it would have been impossible for his superiors and the USA Army to miss it and unconscionable for them to ignore it.

19.     Further, upon information and belief, the USA Army and its members had seen this disturbing behavior, had knowledge of Hunt's declining mental health, and failed to act, intervene, provide services to Hunt, or report his behavior to the Federal Bureau of Investigation ("FBI").

20.     Hunt served as an active-duty U.S. Army recruiter assigned to the United States Army Recruiting Station in Surprise, Arizona, for approximately two years prior to July 3, 2022.

21.     In this capacity, Hunt worked in a civilian-facing office under the direct supervision and authority of a Recruiting Station Commander, a Battalion Commander, and an associated chain of command, all of whom had regular, in-person contact with Hunt and full command authority over him at all times as an active-duty soldier.

22.     Hunt served combat deployments in both Iraq and Afghanistan during his Army career, as confirmed by the statement of his sister to the Surprise Police Department.

23.     Upon information and belief, as a combat veteran of both theaters, Hunt was subject to mandatory post-deployment health reassessment protocols under Department of Defense programs requiring behavioral health screenings at defined intervals following combat deployments.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

24.     These screenings were not discretionary; they were mandatory military health obligations that created a documented psychiatric history within the Army's Military Health System.

25.     Reviewing the incident report from Surprise Police shows that the police worked directly with the Army to determine Jason Hunt's mental health history.

26.     Special Agent Mitchell Keeton with the U.S. Army Criminal Investigation Division, U.S. Army Drug Suppression Team Investigator Christian Rodriguez, and Lieutenant Klarkowski were involved in the investigation to provide Surprise police information relating to Army records.

27.     To be clear, the Army knew about Hunt's struggles with mental issues. They provided a highly redacted mental health history that shows Jason Hunt had received treatment for nearly a decade prior to the incident, including:

Jason Hunt was deployed to Iraq and Afghanistan as an infantryman (llB). His most recent deployment was 2012. Keeton interviewed Jason Hunt's co-workers and the following was reported.

-Mark Loo reported that Jason Hunt **REDACTED**
-Joseph Goodson stated Jason Hunt **REDACTED**
-Micheal Ruiz Jason Hunt informed him about the recent passing of his friend due to kidney failure. Jason mentioned that he planned to cut back on drinking.
-Cody R. Mauro stated Jason Hunt **REDACTED** his new position as a U.S. Army recruiter. Hunt recently scheduled time off to visit his new grandson. Hunt's wife and daughter attended his daughter's stepfather funeral in North Dakota about one week prior to the incident.

On 07/19/2022, Keeton provided Lieutenant Klarkowski with an email that summarize Jason Hunt's behavioral health record. A U.S. Army **REDACTED** (LTC Miller) provided the following review starting August 2012 through May 2, 2022.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

-November 2012, during a post-deployment behavioral health screening Jason Hunt **REDACTED**
- December 2012, SFC Hunt began reporting **REDACTED**
- Between January and February 2013 Hunt reported **REDACTED**
-April 2013, Hunt was cleared to perform recruitment duties.
-August 2020, Hunt started **REDACTED** resulting from increased responsibilities. Hunt reported **REDACTED**
-January 2021, Hunt worked on **REDACTED**
-February 2022, Hunt **REDACTED** Hunt denied any suicidal ideation, intent, or plans despite reporting **REDACTED**
-February 15, 2022, during a follow-up appointment with **REDACTED**
-March 28, 2022, during **REDACTED**
During his last appointment on 2 May 2022, Hunt reported that he was doing well since he **REDACTED** again.

28.    In February 2022, the record indicates that Hunt denied suicidal ideation, intent, or plans *despite reporting REDACTED.*

29.    At the time of his death on July 3, 2022, forensic toxicology testing by NMS Labs (Workorder 22240569, performed on Iliac Blood specimen collected July 6, 2022, and confirmed by the Maricopa County Medical Examiner, OME Case 22-06860, signed August 25, 2022 by Dr. Jennifer Corneal, MD) confirmed the presence of the following substances in Hunt's blood:

(a) Sertraline at 120 ng/mL and its principal active metabolite Desmethylsertraline at 330 ng/mL;
(b) Amphetamine at 21 ng/mL;
(c) Amlodipine (presumptive positive); and
(d) Ethanol at 262 mg/dL (Blood Alcohol Concentration of 0.262 g/100mL) by iliac blood and 390 mg/dL by vitreous fluid.

30.    According to the Mayo Clinic, Sertraline is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety disorder (SAD).

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

31.    Furthermore, Sertraline belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs). It works by increasing the activity of a chemical called serotonin in the brain.

32.    Hunt's confirmed sertraline blood level of 120 ng/mL and desmethylsertraline level of 330 ng/mL are clinically significant: according to the NMS Labs toxicology report, fifteen adults taking 200 mg daily, the maximum prescribed adult dose, had a mean trough serum concentration of only 29 ng/mL of sertraline (range 9–82 ng/mL) and mean trough serum concentration of 87 ng/mL desmethylsertraline (range 40-189 ng/mL).

33.    Hunt's confirmed levels exceeded the reported range for patients on the maximum therapeutic dose.

34.    As an active-duty soldier, and upon information and belief, Hunt's sertraline prescription was issued through and tracked by the Army's Military Health System.

35.    Therefore, his Army prescribing physicians knew of his depressive disorder diagnosis and his prescription medication regimen.

36.    Amphetamine at 21 ng/mL was also confirmed in Hunt's blood, consistent with a therapeutic prescription for amphetamine-based medication (such as Adderall) for attention deficit hyperactivity disorder (ADHD).

37.    Amphetamine is a Schedule II controlled substance under federal law.

38.    Prescriptions for Schedule II controlled substances require mandatory monitoring by the prescribing physician.

39.    Upon information and belief this includes documentation in the Army's Military Health System and periodic fitness assessments.

40.    Hunt's Army-connected prescribing physician was required to monitor his compliance and functioning, including the risk of combining a stimulant with alcohol.

41.    Amlodipine, a calcium channel blocker used for hypertension, was additionally identified in Hunt's blood, confirming upon information and belief that Hunt had at least three concurrent active prescriptions being managed through the Army's Military Health System or TRICARE-connected providers.

42.    The co-administration of an SSRI antidepressant, a Schedule II stimulant, and a cardiovascular medication, combined with documented heavy alcohol use, constituted a pharmacological profile that the Army's prescribing physicians were clinically obligated to monitor and address.

43.    Hunt's blood alcohol concentration at the time of his death was 0.262 g/100mL which is more than three times the legal driving limit of 0.08 in Arizona.

44.    His vitreous fluid ethanol level of 390 mg/dL indicates a peak blood alcohol concentration approaching 0.39 during the evening of July 3, 2022.

45.    Evidence from the crime scene, documented by Surprise Police Department investigators, included an open bottle of Tito's Vodka and an empty bottle of the same found on the same kitchen counter as multiple prescription medication bottles prescribed to Jason Hunt.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

9

46.     The combination of prescription psychiatric medications and alcohol at the level confirmed by toxicology is contraindicated and constitutes a clinically dangerous condition that Hunt's Army prescribing providers were obligated to assess and address.

47.     Multiple prescription medication bottles prescribed to Jason Hunt were recovered from his kitchen counter by Surprise Police Department investigators at the crime scene.

48.     Court paperwork and medical release forms were also found on the kitchen countertop of Hunt's residence.

49.     Upon information and belief, these document legal or administrative proceedings involving Hunt's medical status that the Army was aware of or was a party to.

50.     The Health Insurance Portability and Accountability Act (HIPAA) specifically provides a military command exception authorizing a soldier's commanding officer to obtain full access to the soldier's psychiatric diagnoses, prescription medications, and treatment history from Army medical providers.

51.     Hunt's chain of command at the Surprise Army Recruiting Station therefore had full legal authority to access his complete Military Health System medical records at any time, including his psychiatric diagnoses, his sertraline and amphetamine prescriptions, and any behavioral health assessments conducted in connection with his post-deployment screening obligations.

52.     The United States cannot disclaim knowledge of Hunt's psychiatric profile when federal law specifically authorized, and Army regulations required, it to access that information.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

53. For approximately two weeks prior to the Incident, Hunt staged a table in his residence displaying multiple firearms, including rifles, a shotgun, and two holstered handguns, along with approximately 1,000 rounds of loaded ammunition, as confirmed by the statements of witness Jason Perkins and Hunt's wife Jennifer Hunt to Surprise Police Department investigators.

54. Jennifer Hunt stated that the table "had been set up for about two weeks and Jason used the table to clean his guns."

55. Hunt also showed these weapons to at least one neighbor, Perkins, on the evening of the Incident.

56. This progressive, visible weapons-staging behavior combined with his public-facing social media posts was observable to Hunt's Army colleagues and supervisors who had contact with him during this period.

57. The Maricopa County Medical Examiner's Report found no significant natural disease in Hunt's autopsy.

58. His violent conduct was not the product of a sudden, unforeseeable biological event.

59. It was the product of a documented, prescription-medication-requiring psychiatric profile including depression and ADHD, each requiring prescription monitoring.

60. These would have been managed by the Army's own medical providers.

61. The Army's mandatory obligations with respect to Hunt's psychiatric conditions, weapons access, and fitness for duty were established by specific Army regulations and Department of Defense instructions, as described below.

62. Army Regulation 40-501, ¶¶ 3-31 – 3-35, (Standards of Medical Fitness) imposes referral and evaluation obligations on Army medical personnel when a soldier's psychiatric or behavioral health condition affects his or her fitness for duty.

63. AR 40-501, ¶ 3-3 (Disposition) and the overarching ¶ 3-1, together mandate: "Soldiers with any medical condition, injury, or defect (individually or in combination) that meets the definition of a disqualifying medical condition or physical defect as stated in paragraph 3–1 **will be referred to DES** [Disability Evaluation System]." (Emphasis added).

64. These include disorders with psychotic features; mood disorders; anxiety, somatoform, or dissociative disorders; dementia and other cognitive disorders due to general medical condition; personality, exhibitionism, transvestism, voyeurism, other paraphilias, or factitious disorders, disorders of impulse control not elsewhere classified; and adjustment disorders.

65. The Medical Board review process, which Army Regulation 40-501 and Army Regulation 635-40 (Disability Evaluation for Retention, Retirement or Separation) jointly govern, is initiated by the soldier's treating physician and is mandatory when the treating physician concludes the soldier is not fit for duty.

66. These are not discretionary clinical judgments; they are mandatory protocol-driven obligations.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

12

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

67.     Army Regulation 190-11 (Physical Security of Arms, Ammunition and Explosives) addresses weapons access by Army personnel and specifically allows and, in appropriate circumstances requires, a commanding officer to restrict a soldier's access to firearms and to arrange for the storage of a soldier's personal weapons in the unit arms room when the soldier's fitness is in question.

68.     Department of Defense Instruction 6490.04 (Mental Health Evaluations of Members of the Military Services) establishes mandatory protocols for command-directed behavioral health evaluations, including for combat veterans serving in active-duty roles.

69.      Army Regulation 600-20 (Army Command Policy) imposes mandatory duties on commanders regarding the health, welfare, and fitness of soldiers under their command.

70.     The Army's failure to invoke these mandatory provisions with respect to Jason Hunt who was a combat veteran on psychiatric medications with an observable escalating weapons profile constitutes a breach of specific mandatory obligations that removes the protection of the Federal Tort Claims Act's Discretionary Function Exception.

71.     The Army's prescribing physicians who upon information and belief issued Hunt sertraline for depression and amphetamine for ADHD owed a duty of care not only to Hunt as their patient, but once informed that Hunt was displaying violent tendencies to harm people, to third parties who Hunt might harm if his known psychiatric conditions were left inadequately monitored and addressed.

72.     Under Arizona law, "Restatement (Third) of Torts § 41(a) (Am. L. Inst. 2012) is more specific, providing that '[a]n actor in a special relationship with another owes

13

a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship' *See Dinsmoor* , 251 Ariz. at 376 ¶ 24, 492 P.3d at 319 (holding that a duty arises only where a 'known and tangible risk of harm' exists within the special relationship). Restatement (Third) § 41(b)(4) defines that applicable special relationship to include 'a mental-health professional with patients.'" *Avitia v. Crisis Preparation and Recovery Inc*., 107 Arizona Cases Digest 31, 536 P.3d 776 (Ariz. 2023), 785.

73.     In *Sheridan v. United States*, 487 U.S. 392, 401-03 (1988)., the Supreme Court held the United States liable for the failure of naval personnel to report or subdue a visibly intoxicated servicemember armed with a rifle who later shot civilians.

74.     The facts here are directly analogous: Hunt was severely intoxicated (BAC 0.262), armed, on his psychiatric medications, and had been displaying escalating weapons behavior for weeks.

75.     Upon information and belief, this was all known to or knowable by the Army.

76.     The Army's failure to act created the risk that materialized on July 3, 2022.

77.     Arizona has no red flag law or yellow flag law that would have provided a civilian mechanism for restricting Hunt's access to his weapons.

78.     The Army was therefore the only institution with both knowledge of Hunt's psychiatric profile and legal authority to act.

79.     Its failure to do so was a proximate cause of Plaintiff's catastrophic injuries.

///

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

14

**ADMINISTRATIVE EXHAUSTION AND TOLLING**

80.     On June 28, 2024, Mendez submitted a proper tort claim under the FTCA (Form 95) to the USA Army locations in Surprise, Arizona, and to Fort Huachuca in Sierra Vista, Arizona.

81.     The USA Army acknowledged the receipt of the claim on July 3, 2024, and assigned claim number 24-051-T028 to the claim.

82.     On September 30, 2024, the USA Army, Office of the Judge Advocate General, denied the claim and issued a denial letter.

83.     This suit was commenced within six (6) months of that denial.

**STATEMENT OF INJURIES AND DAMAGES**

84.     Mendez has sustained injuries as a result of the negligent failures of the Army.

85.     He has had surgeries, therapy, emotional trauma, and has lost one of his eyes permanently.

86.     Early medical damages exceed $125,000 – including $109,050.10 at Banner Thunderbird (5555 W. Thunderbird Rd, Glendale, AZ 85306) after being airlifted from Banner Del E Webb, and $17,506.90 at Banner Del E Webb (14502 W. Meeker Blv., Sun City West, AZ 85375), but the emotional damages and physical disabilities are lifelong.

87.     Raul has been treated at several other locations following his hospital stays, and continues to receive care related to the injuries sustained in the Incident.

///

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

15

**CLAIMS FOR RELIEF**

**COUNT I**
**FIRST CLAIM FOR RELIEF**

**Violation of Federal Tort Claims Act 28 U.S.C. 1346(b)(1)(for negligence and negligent hiring training and supervision)**
**(Against all Defendants)**

88.     Plaintiff incorporates by reference paragraphs 1 through 46 above as though fully set forth herein.

89.     Because six months has now passed since giving notice of the claim and delivering the Form 95 and Plaintiff has sufficiently exhausted his administrative remedies entitling him to now file a claim pursuant to the Federal Tort Claims Act.

90.     The aforementioned conduct of the USA Army and its members were negligent to the protection of the public.

91.     The USA Army has a duty to protect the public from harm resulting from the actions of its servicemembers.

92.     By failing to supervise Hunt as an active duty servicemember, the USA and the Army breached its duty to prevent harm to the public, including Plaintiff.

93.     By failing to address the mental health concerns of Hunt, the USA has breached that duty to the public including Plaintiff in this action.

94.     By failing to report to the FBI that Hunt was deteriorating mentally and was displaying a propensity of violence and behavioral pattern of idolatry of weaponry with statements posted publicly that he was going to party with his weapons, USA has breached its duty to the public including Plaintiff.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

16

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

95. By failing to fulfill its mandatory obligations under Army Regulation 40-501 to refer Hunt for a Medical Evaluation Board based on his documented psychiatric conditions requiring prescription medication the Army breached its mandatory duty to assess Hunt's fitness for continued active-duty service with weapons access, and thereby breached its duty to the public, including Plaintiff.

96. By failing to fulfill its mandatory obligations under Army Regulation 190-11 and Department of Defense Instruction 6490.04 to conduct a command-directed behavioral health evaluation of Hunt and to restrict his access to firearms upon grounds establishing that his mental fitness was in question, the Army breached its mandatory duty to protect the public, including Plaintiff.

97. By failing to exercise the military command exception to HIPAA to access Hunt's psychiatric records and connect that clinical information to command decisions regarding Hunt's fitness for duty and weapons access, the Army breached its mandatory duty to the public, including Plaintiff.

98. By failing through its Army-connected prescribing physicians to adequately monitor Hunt's psychiatric medication regimen, assess the dangerous interaction between his prescription medications and documented alcohol consumption, and report the clinical findings through the military command structure as required by Army regulations and DoD instructions, the Army breached its duty to the public, including Plaintiff.

99. By failing to intervene and properly report Hunt, the USA created an unreasonable risk of bodily harm to Plaintiff and caused Plaintiff severe injuries and emotional harm.

17

100.   As a proximate result of the aforementioned acts and omissions of the USA, Plaintiff suffered injuries and damages as set forth above and prayed for below.

101.   The United States of America is liable for the conduct of the Army and its members as asserted under the Federal Tort Claims Act.

102.   As a proximate result of the Defendants' wrongful conduct, Plaintiff suffered injuries and damages as set forth above and prayed for below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1. For judgment in favor of Plaintiff and against Defendants;

2. For all available general and special damages in the amount of $1,500,000.00 or according to proof at trial;

3. For all damages allowed by law;

4. For interest at the maximum legal rate pursuant to law;

5. For Costs and attorney's fees if allowed by law;

6. For any other such relief, whether legal or equitable, that the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED** this 23rd day of March 2026.

**MILLS + WOODS LAW, PLLC**

By   */s/ Sean A. Woods*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiff*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Neil Singh
neil.singh@usdoj.gov
celescia.broughton@usdoj.gov
CaseView.ECF@usdoj.gov
**UNITED STATES ATTORNEY**
**DISTRICT OF ARIZONA**
Two Renaissance Square
40 N Central Ave., Ste. 1800
Phoenix, AZ 85004-4449
(602) 514-7500
*Attorneys for Defendant United States*


　　　*/s/ Ben Dangerfield*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556